UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIMON GILL,<br><br>          Plaintiff,<br><br>   v.<br><br>CHEVRONTEXACO CORPORATION, a Delaware corporation, TEXACO INC., a Delaware corporation,<br><br>          Defendants.<br>_____<br>AND RELATED CROSS-ACTION.<br>_____ | 1:05-cv-00272 OWW LJO<br><br>SCHEDULING CONFERENCE ORDER<br><br>Cross-Motions for Summary Judgment Filing Deadline: 7/14/06<br><br>Opposition Filing Deadline: 7/31/06<br><br>Reply Filing Deadline: 8/7/06<br><br>Hearing Date: 8/28/06 9:00 Ctrm. 2 |

I.   Date of Scheduling Conference.

     December 8, 2005.

II.  Appearances Of Counsel.

     Alexander & Associates, PLC, by William L. Alexander, Esq., appeared on behalf of Plaintiff.

     Pillsbury, Winthrop, Shaw, Pittman LLP by Dawn M. Bradberry, Esq., appeared on behalf of Defendants.

III. Summary of Pleadings.

     <u>Plaintiff's Statement</u>

     1.   Plaintiff was an oil field engineer originally employed

1

by Defendant Chevron Texaco Corporation's ("CT") predecessor in interest, Texaco, Inc., in about 1980. After the Chevron-Texaco merger, Mr. Gill continued to work for the new entity, CT, in rotational overseas assignments. During periods of 2002 and 2003, he was employed as a manager of Kazakhstan operations. Because of many years of employment with Texaco, Mr. Gill was entitled to benefits vested under Texaco's "Separation Pay Plan" ("SPP"), which is CT's denomination for the "Summary Plan Description ("SPD") and Employee Welfare Benefit Plan ("EWBF"), as defined and regulated by ERISA.

2.   Texaco's SPP expressly provided enhanced benefits for participating employees, such as Mr. Gill, in the event of a "Change of Control" (hereinafter "COC"). Texaco's merger with Chevron was a COC. In or about the summer of 2003, the defendants advised Mr. Gill that the Kazakhstan oil field project where he was employed was being sold; that his employment would be terminated as of September 30, 2003; and that he had to make prompt decisions regarding options for benefits allowable under the current EWBP. Mr. Gill inquired as to the options available and specifically requested a payout estimate under the COC provisions. Mr. Gill was assured that his separation benefits would be paid without income tax or other similar deductions (such as Medicare), as Mr. Gill was not a United States citizen (and was not obligated to pay taxes to other nations which had granted him citizenship).

3.   Notwithstanding confirmation of these representations, the defendants improperly withheld taxes and other amounts from the same. Mr. Gill now seeks declaratory relief, and money

2

damages, both of which will require an accounting of all monies due him under the defendants' ERISA plan.

4. Many documents and witnesses supportive of Mr. Gill's claims were within the actual control of the defendants. While it is believed that many former employees who had first hand knowledge of matters relating to Mr. Gill's claims have been terminated from the defendants' employ, the defendants are largely the only parties in possession of such witnesses' last known addresses or other contact information.

5. The money unilaterally withheld by the defendants from Mr. Gill's salary, and retained by the defendants, was money purportedly due for income or other taxes payable by Mr. Gill to the United States Treasury or other similarly situated taxing authorities of those countries in which Mr. Gill was a resident or citizen. This is sometimes known or described as "theoretical income tax."

6. Defendants concede that they did not pay the withheld money to the United States Treasury or any other similarly situated taxing authority of those countries in which Mr. Gill was a resident or citizen, and that defendants retain, and continue to retain, all such amounts withheld. Defendants contend they have the right to retain such money.

7. Mr. Gill contends that he is entitled to all such money unilaterally withheld by defendants from Mr. Gill's salary for theoretical income taxes purportedly payable by Mr. Gill, that defendants wrongfully withheld such money, that Mr. Gill has no such liability for income taxes to the United States Treasury or any other similarly situated taxing authority of those countries

in which Mr. Gill was a resident or citizen, and that defendants are not entitled to possession or ownership of such money.

8.   In addition to the above, Mr. Gill's successful efforts to not be subject to the income or similar taxes of any government actually resulted in monetary benefit to the defendants, as discussed below.

**Chevron's Statement**

1.   Plaintiff Simon Gill was employed by Texaco Inc., on or around October 9, 2001, when Texaco Inc., became a subsidiary within the Chevron Corporation controlled group.  Following the Chevron-Texaco merger, Plaintiff was employed by Chevron on overseas assignment at Chevron's North Buzachi operation in Aktau, Kazakhstan.  Plaintiff's employment terminated effective October 9, 2003, following Chevron's sale of the North Buzachi operation.  Plaintiff received substantial Change of Control payouts under the Separation Pay Plan of Texaco Inc., at that time, but sued under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 <u>et seq.</u> ("ERISA") contending that those payouts should have been larger.  The parties recently reached a settlement of Plaintiff's ERISA claim and that claim was dismissed.  No further issue remains as to the amount of Mr. Gill's benefits under ERISA.

2.   Mr. Gill's complaint contains one remaining claim for declaratory relief challenging amounts withheld from his salary and Change of Control payout under Chevron's tax equalization policy.  The Chevron Tax Equalization Policy (the "CTEP") and its predecessor, the Texaco Expatriate Tax Equalization Policy (the "ETEP"), are mandatory programs applicable to expatriate

4

employees.  The policies "equalize" the tax effect of an expatriate assignment by ensuring that expatriate employees shoulder the same tax burden - pay no more and no less - while working abroad that they would if they were working in their home country.  Pursuant to the policies, Chevron pays the taxes owed by expatriate employees to their international host countries, and in some cases to their home countries, during their international assignment.

    3.    Under the CTEP, expatriate employees like Mr. Gill are responsible <u>to Chevron</u> for the home country tax obligation that they <u>would have incurred</u> if they had worked in their home country for the duration of their international assignment.  Thus, Chevron withholds from the expatriate employee's income a "theoretical home country tax."  At the end of each calendar year of the international assignment, KPMG LLP (at Chevron's expense) performs a "tax equalization calculation," which involves comparing the expatriate employee's theoretical home country tax and actual home country tax expenditures to a "hypothetical stay-at-home calculation."  The hypothetical stay-at-home calculation reflects what the expatriate employee's tax liability <u>would have been</u> had he or she worked in his or her home country for the entire period in question.  Expatriate employees are responsible to Chevron for the full amount of this "stay-at-home" tax.  If, at the end of a calendar year, the expatriate's theoretical home country tax and actual home country tax payments exceed the hypothetical stay-at-home tax, then Chevron pays the difference to the employee.  Conversely, if the hypothetical stay-at-home tax exceeds the sum of the theoretical home country tax and

actual home country taxes paid by the employee, then the expatriate employee owes the difference to Chevron.  For international expatriates, year-end tax equalizations are generally initiated by a request from the employee.

4.   In accordance with the CTEP and the ETEP, Chevron retained theoretical home country taxes from Mr. Gill's pay and from his Change of Control payout.  Mr. Gill was well aware of the applicable tax equalization policies.  With each international assignment that Mr. Gill accepted, he received a written breakdown of his pay, the amount of theoretical home country taxes to be withheld, and the other benefits to which he was entitled.  Theoretical home country taxes were withheld from Mr. Gill's pay from the inception of each international assignment.  Mr. Gill, however, did not consistently request assistance from KPMG at year-end with the filing of his home country tax returns and a concurrent tax equalization calculation.

5.   When an international expatriate does not request a tax equalization, Chevron treats the situation as though the employee's hypothetical "stay-at-home" tax were equal to the amount of theoretical home country tax withheld.  If Mr. Gill believed that Chevron had deducted more in theoretical home country taxes than he would have owed had he worked for Chevron in his home country for the full tax years in question, he could have requested that KPMG assist him in filing returns for such periods and conduct tax equalizations.  He did not do so.  Instead, Mr. Gill has advanced the fiction that he has no "home country" and thus cannot be liable for any home country taxes.

6

As set forth below, this argument misapprehends expatriate tax equalization in general, and the CTEP in particular.

<u>**Plaintiff's Summary of Remaining Claims and Defenses**</u>

1. <u>Issue No. 1</u>.  The first issue is the income tax deducted from Mr. Gill on a monthly basis from May 2000, until he left the company on October 9, 2003.  This amount is $47,329.26.  Chevron's tax equalization policy does not apply to Mr. Gill for the following reasons.  First, in May 2000 Mr. Gill left Canada at his own expense and established, at his own expense, that he was no longer subject to home country tax.  Based upon the Texaco policy at the time, if an individual reduced his home country tax obligation, by moving at his own expense, he and not the company benefitted from the reduction in home country tax.  Second, between May 2000 and his resignation from CT on October 9, 2003, he had no home country tax obligation and did not participate in the company's tax equalization program.  During this time, and while CT deducted theoretical tax from his paycheck, CT did not require Mr. Gill to complete CT's tax equalization calculations.

2. The money due to Mr. Gill under Issue No. 1, plus 10% per annum interest, equates to roughly $64,000.00.

3. <u>Issue No. 2</u>.  The second issue is that after leaving the company, at which point there can be no doubt that Mr. Gill was no longer subject to CT policies, defendants deducted $10,443.66 from a payment that was made in lieu of vacation not taken.  This deduction was made on October 22, 2003.  Again, this money was kept by defendants and not paid to any tax authority.

4. The amount due under this item, plus 10% per annum interest, equates to roughly $13,000.00.

7

1    5.   **Issue No. 3**.  The third issue is that on November 7, 2003, 29 days after Mr. Gill had left the company, CT paid him the change of control separation lump sum, but deducted 30% for theoretical tax.  This amounted to roughly $110,000.00.  The defendants did not have the right to deduct this money for the following reasons.  First, and as discussed above, Mr. Gill had not been participating in the tax equalization program since May 2000.  Second, prior to electing to take the separation package, Mr. Gill was assured in writing that tax would not be deducted.  And third, the separation package lump sum was paid after Mr. Gill's separation from the company and, therefore, his tax obligations were his responsibility.

6.   The amount claimed under Issue No. 3 is roughly $132,000.00.

7.   **Issue No. 4**.  The fourth issue is that Mr. Gill's successful efforts to not be subject to the income or similar taxes of any government actually resulted in monetary benefit to the defendants.  Specifically, the defendants were able to avoid tax payments they would have been required to make, as an employer, to make payments to the taxing government on the income earned by Mr. Gill.  The defendants would be unjustly enriched if they were allowed to retain the theoretical taxes withheld.  They would also be unjustly enriched if, in addition, they were permitted to reap the benefits of Mr. Gill's efforts to remain not subject to any taxing authority.

8.   The amount claimed under Issue No. 4 is still unknown.  Much of the evidence will likely come from the defendants, which has not yet been produced.

8

**Chevron's Summary of Remaining Claims and Defenses**

1. In this lawsuit, Mr. Gill challenges the theoretical home country tax that Chevron withheld from his pay and from his Change of Control payout. Specifically, Mr. Gill contends that: (1) the funds withheld were not remitted to any taxing authority; and (2) he does not owe taxes to any country because he is a citizen of three countries (Canada, the United Kingdom, and Trinidad).

2. Mr. Gill misunderstands both the purpose and the terms of the tax equalization policies that applied to his employment. First, Mr. Gill's assertion that the theoretical home country taxes were not remitted to any taxing authority is a red herring. The tax equalization policies required no such remittance. Theoretical home country taxes are "theoretical" rather than real tax obligations; they are owed to Chevron, not the government. Theoretical home country taxes are treated as an advance against the employee's hypothetical 'stay-at-home' calculation, which is the amount he would have been obligated to pay had he worked in his designated home country for the entire term of the international assignment. The hypothetical stay-at-home calculation is paid to Chevron to equalize the tax effects of international assignments for expatriate employees.

3. Mr. Gill's second contention - that he should not have to pay theoretical taxes to Chevron because he owes no taxes to any government - is equally meritless. Under the CTEP and the ETEP, the fact that an expatriate employee may not actually owe taxes does not relieve the obligation of paying <u>theoretical</u> home country taxes to Chevron. Assuming without conceding that Mr.

9

Gill could have managed his physical presence in three countries to avoid owing actual taxes in any of them (as well as the attendant filing requirements), he still cannot avoid liability under the CTEP and ETEP.  The tax equalization policies were designed to prevent employees from being better or worse off tax-wise due to the expatriate assignment.  Accordingly, Chevron withheld from affected employees an amount estimated to equal the taxes <u>they would have paid had they worked in their home country for the duration of the international assignment</u>.  Where the employees actually resided is thus irrelevant.  Affording Mr. Gill the relief he seeks would give him an unfair advantage over other Chevron employees (both domestic and expatriate) by giving him a "free ride" on all taxes, both theoretical and real.  That would undermine Chevron's longstanding efforts to equalize the tax effects of its employees' expatriate assignments.

      4.   The sole document that Mr. Gill relies upon to support his tax equalization claim is a single e-mail message from former employee Dolores Matzat dated August 12, 2003, which stated: "I have been told that your COC gross payment would be your net payment - no taxes taken out."  Ms. Matzat's e-mail message was not authorized by Chevron, and was incorrect.  Several authorized representatives of Chevron promptly informed Mr. Gill that his Change of Control payout was subject to the tax equalization policy.  Moreover, Mr. Gill cannot have relied upon Ms. Matzat's representation.  Because Mr. Gill was laid off when Chevron closed the North Buzachi operation, he had no option other than to accept the Change of Control payout less the theoretical home country tax deduction.

**Chevron's Counter-Claim**

1.  Chevron has responded to Gill's suit by filing a counter-claim under the CTEP and ETEP.  Chevron's counter-claim asserts that: (1) theoretical home country taxes were property withheld from Mr. Gill's pay and Change of Control payout; and (2) had Mr. Gill requested tax equalization calculations for the last several years of his employment, they would have shown that Mr. Gill owes Chevron additional funds because his hypothetical stay-at-home tax exceeded the sum of the theoretical home country tax withheld by Chevron and the actual home country taxes that Mr. Gill paid.

2.  After discovery, Chevron will ask KPMG to conduct a tax equalization based on the information obtained from Mr. Gill. Based on what we know to date, Chevron is confident that Mr. Gill's hypothetical stay-at-home calculation will exceed the sum of the theoretical home country tax withheld by Chevron and the actual home country taxes Mr. Gill paid.  The reason is simple. Absent a designation of home country from Mr. Gill, Chevron calculated Mr. Gill's theoretical home country tax withholding based upon U.S. tax rates.  However, Mr. Gill's hypothetical stay-at-home calculation most likely would have been calculated based on Canadian tax rates, which are significantly higher than those of the U.S., because Mr. Gill's designated "point of origin" in company records was Canada.  Using Canadian tax rates, Mr. Gill's hypothetical stay-at-home tax calculation likely would have exceeded the sum of the theoretical home country tax withheld and any actual taxes he paid.  Under the CTEP and ETEP, Mr. Gill owes Chevron the difference.

**Summary of Procedural Background**

1.   On February 22, 2005, Plaintiffs Simon Gill and William Hatcher filed separate actions against Chevron under ERISA alleging that they were entitled to additional severance benefits under the Separation Pay Plan of Texaco, Inc.  As explained above, Mr. Gill's complaint also included a tax equalization claim.

2.   Although the Gill and Hatcher cases were filed separately in the Eastern District of California, this Court consolidated the cases at the Mandatory Scheduling Conference on June 23, 2005.  Based on the parties' representation that Mr. Gill's tax equalization claim would likely be resolved informally, the Court scheduled the plaintiffs' ERISA claims for resolution by cross-motions for summary judgment on July 17, 2006, and did not set a trial date.  The Court also set a briefing schedule to resolve the extent of discovery, if any, that would be permitted with respect to the plaintiffs' ERISA claims.  On August 15, 2005, Magistrate Judge O'Neill granted Chevron's motion to limit discovery on the ERISA claims to the administrative record.  In late September 2005, the parties reached an informal settlement of the ERISA claims.  On October 7, 2005, the parties filed a stipulated request and order for dismissal with prejudice of the ERISA claims, leaving only Mr. Gill's tax equalization claim at issue.

3.   On November 1, 2005, the parties attended a telephonic settlement conference with Magistrate Judge O'Neill to attempt to resolve Mr. Gill's tax equalization claim.  The parties were not able to resolve the matter during the settlement conference.

Apart from initial disclosures, no discovery has been conducted to date regarding Mr. Gill's tax equalization claim.  Because no trial date has been set and Chevron plans to file a motion for summary judgment, the parties requested a further scheduling conference.

IV.   Orders Re Amendments To Pleadings.

   1.   The parties do not anticipate filing any amendments to the pleadings at this time as the ERISA claims do not exist and the Plan and Plan Administrator do not need to be added as defendants.

V.   Discovery Plan and Cut-Off Date.

   1.   The parties are ordered to complete all discovery on or before June 30, 2006.

   2.   The parties are directed to disclose all expert witnesses, in writing, on or before April 30, 2006.  Any supplemental expert disclosures will be made on or before May 30, 2006.  The parties will comply with the provisions of Federal Rule of Civil Procedure 26(a) regarding their expert designations.  Local Rule 16-240(a) notwithstanding, the written designation of experts shall be made pursuant to F. R. Civ. P. Rule 26(a)(2), (A) and (B) and shall include all information required thereunder.  Failure to designate experts in compliance with this order may result in the Court excluding the testimony or other evidence offered through such experts that are not disclosed pursuant to this order.

   3.   The provisions of F. R. Civ. P. 26(b)(4) shall apply to all discovery relating to experts and their opinions. Experts may be fully prepared to be examined on all subjects and

13

opinions included in the designation.  Failure to comply will result in the imposition of sanctions.

VI.   Pre-Trial Motion Schedule.

    1.   All Dispositive Pre-Trial Motions, and cross-motions for summary judgment, will be filed on or before July 14, 2006. Each party's opposition shall be filed on or before July 31, 2006.  Any replies shall be filed by August 7, 2006.  The cross-motions for summary judgment shall be heard on August 28, 2006, at 9:00 a.m. before District Judge Oliver W. Wanger in Courtroom 2.

    2.   Depending upon the outcome of the cross-motions for summary judgment, a further scheduling conference will be scheduled after disposition of the motions.

DATED:   December 8, 2005.

                                                /s/ OLIVER W. WANGER
                                                   Oliver W. Wanger
                                            UNITED STATES DISTRICT JUDGE

gill v. chevron sch con

14